UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OLADAYO OLADOKUN,

Plaintiff,

-v-

WARDEN RICKARD,

Defendant.

25-CV-04749 (JAV)

OPINION AND ORDER

JEANNETTE A. VARGAS, United States District Judge:

Before the Court is a *pro se* petition for the writ of habeas corpus, pursuant to 28 U.S.C. § 2241, filed by Oladayo Oladokun ("Petitioner" or "Oladokun"), who is currently incarcerated at FCI Otisville in Otisville, New York. ECF No. 1 ("Petition" or "Pet."). The Petition alleges that the Bureau of Prisons ("BOP") miscalculated the score associated with Oladokun's custody classification and security designation, resulting in his erroneous placement at a medium-security prison and his related ineligibility for certain earned time credits, rehabilitative programming, and safer conditions at a lower security prison. *Id.* at 2-4. For the following reasons, the Petition is **DENIED**.

## BACKGROUND

On February 1, 2023, the U.S. District Court for the Southern District of New York sentenced Petitioner to a 125-month term of imprisonment for conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344, 1349, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), (a)(1)(b)(i). ECF No.

14 ("Blakley Decl."), ¶ 5 & Ex. 1. Most recently, on October 9, 2025, FCI Otisville staff assessed Petitioner's security risk level pursuant to BOP Program Statement 5100.08, Inmate Security Designation and Custody Classification. *Id.*, ¶ 6; U.S. Dep't of Just., Fed. Bureau of Prisons, Program Statement 5100.08, *Inmate Security Designation and Custody Classification* (updated May 6, 2026), https://perma.cc/E2WK-9SRL ("PS 5100.08"). FCI Otisville staff assessed Petitioner to be a medium level of risk based on his total score of 18 points. Blakley Decl., ¶¶ 6-7 & Ex. 2. For men, a score of 16-23 points results in a medium security level, whereas a score of 12-15 points results in a low security level. PS 5100.08 ch. 1 at 2. Petitioner contends he should have been classified in the low-risk range. Pet. at 12.

**A. History of Violence**

To calculate Petitioner's security and custody score, the BOP assigned Petitioner's "History of Violence" a severity designation of "serious" as opposed to "minor," resulting in a 4-point addition to his score. Blakley Decl., ¶ 8 & Ex. 2; PS 5100.08 ch. 4 at 9. Petitioner contends that his history of violence should have been classified as minor and thus worth only 1 point. PS 5100.08 ch. 4 at 9; Pet. at 4-6.

PS 5100.08 determines this severity assessment "by the offense behavior regardless of the conviction/finding of guilt offense," and classifies a "serious" history as including "[a]ggressive or intimidating behavior which is likely to cause serious bodily harm or death (e.g., aggravated assault, domestic violence, intimidation involving a weapon, incidents involving arson or explosives, rape, etc.)," for which there was a finding of guilt. PS 5100.08 ch. 4 at 9-10. The BOP

based its severity designation of Petitioner's history of violence on the presentencing report ("PSR") associated with his November 2013 conviction for second-degree assault in Maryland. Blakley Decl., ¶ 8. The PSR reflected that Petitioner had broken into his former girlfriend's home, jumped on her bed, and choked her to keep her from screaming, though she ultimately escaped to a neighbor's house. *Id.*

Petitioner argues that his history of violence classification should have been determined through a categorical assessment of the statute under which he was convicted—which does not differentiate between violent and nonviolent conduct—rather than through an individual assessment of the facts leading to his conviction. Pet. at 4-6.

**B. Severity of Offense**

The severity of Petitioner's instant offense also impacted his custody score. PS 5100.08 dictates that the BOP calculate the severity of an offense using "the most severe documented instant offense behavior regardless of the conviction offense." PS 5100.08 ch. 4 at 7. Oladokun's PSR described him as a leader or organizer of the charged bank fraud and money laundering conspiracies for which he was convicted. *United States v. Kukoyi*, 126 F.4th 806, 810-11 (2d Cir. 2025), *cert. denied sub nom. Oladokun v. United States*, 146 S. Ct. 1777 (2026). The PSR characterized his conspiracies as carrying "unrecovered" losses of approximately $105,056 and "intended" losses of approximately $4,178,501. *Id.* The BOP's Offense Severity Scale assigns a point value of 1, or "low-moderate," to property offenses incurring losses between $2,000 and $250,000, and a point value of 3, or

"moderate," to property offenses incurring losses of over $250,000. PS 5100.08 app. A at 3. The BOP relied on the "intended loss" associated with Petitioner's conspiracies to calculate the severity of Petitioner's crime, resulting in a "moderate" determination and a resultant 3-point addition to his score. Blakley Decl., ¶ 9 & Ex. 2. Petitioner contends that this determination improperly inflated his score, which he asserts should have been based on the unrecovered losses associated with his conviction. Pet. at 3.

**C. Other Points**

Petitioner was assigned 0 points for the type of detainer placed on him and any history of drug or alcohol abuse. Blakley Decl., ¶ 10. For his "Frequency of Incident Reports," Petitioner was assigned 1 point for having been sanctioned by a discipline hearing officer for possessing a hazardous tool on or about March 12, 2025. *Id.*, ¶ 11.

The Petition argues that the BOP's consideration of an expunged disciplinary report, a nolle prosequi DUI charge, and his alleged history of alcohol abuse also contributed to Petitioner's inflated custody and security score, Pet. at 2-3, but Petitioner abandons these arguments in his reply brief responding to the government's clarified calculation, *see* ECF No. 16 ("Reply") at 2-6.

**D. The First Step Act**

Congress enacted the First Step Act of 2018 (the "FSA") to, *inter alia*, reduce the federal prison population while also creating mechanisms for maintaining public safety by reducing recidivism risk. *See Rubinov v. Pliler*, No. 21-CV-04397

(LJL), 2021 WL 5567826, at *1 (S.D.N.Y. Nov. 29, 2021) (citing 18 U.S.C. § 3632). The FSA permits people convicted of federal crimes to participate in evidence-based recidivism reduction ("EBRR") programming to accrue earned time credits ("ETCs") toward earlier placement in prerelease custody or a term of supervised release. *See* 18 U.S.C. §§ 3624(g)(1), 3632(d)(4).

Under the earned time credit system, an incarcerated person generally earns 10 days of time credits for every 30 days of successful participation in BOP-approved programming. *Id.* § 3632(d)(4)(A)(i). An incarcerated person who has been assessed as having a "minimum" or "low" risk of recidivating, however, and who has not increased their recidivism risk over at least their last two consecutive assessments, can earn an *additional* 5 days of credit time for every 30 days of successful participation in programming. *Id.* § 3632(d)(4)(A)(ii).

To assess an incarcerated person's recidivism risk, the Department of Justice created the Prisoner Assessment Tool Targeting Estimated Risk and Need ("PATTERN"), which examines 15 risk factors and assigns each factor a certain point value. U.S. Dep't of Just., Off. of Att'y Gen., *The First Step Act of 2018: Risk and Needs Assessment System – Update* (Jan. 2020), https://perma.cc/53SH-C2AH ("PATTERN Assessment"). The fifteen factors contributing to a PATTERN score include 11 dynamic factors—infraction convictions during current incarceration, serious and violent infraction convictions during current incarceration, infraction-free periods during current incarceration, serious and violent infraction-free periods during current incarceration, number of programs completed, work programming,

drug treatment while incarcerated, non-compliance with financial responsibility, history of violence, history of escapes, and education score—as well as four static factors—age at time of assessment, violent nature of instant offense, sex offender status, and criminal history score. *Id.* at 10-11.

**E. Recidivism Assessments**

On March 23, 2023, FCI Otisville staff conducted Petitioner's initial recidivism risk assessment and assigned him a PATTERN score associated with a "medium" recidivism risk. Blakley Decl., ¶ 13 & Ex. 3. Petitioner was also assessed to have a medium recidivism risk after subsequent assessments on April 20, 2023; October 17, 2023; and April 14, 2024. *Id.*, ¶ 14. When Petitioner was reassessed on October 11, 2024, he was found to have a low recidivism risk. *Id.*, ¶ 15. Petitioner maintained his low-risk designation after assessments on April 9, 2025, and October 6, 2025. *Id.*, ¶ 16.

**F. Accrued ETCs**

As of February 18, 2026, Petitioner had earned ETCs equal to 350 days. *Id.*, ¶ 17. As of that date, his projected release date had accordingly been moved up from November 18, 2029, to December 3, 2028. *Id.*, Ex. 1.

**G. Harms Alleged**

Petitioner contends that "[b]ecause classification data feeds directly into the PATTERN risk assessment system, the 5-point inflation" of his security and custody score—comprising the three-point history-of-violence differential and two-point severity-of-offense differential he alleges—incorrectly inflated his PATTERN score

from low to medium. Reply at 6. Petitioner asserts that "but for the misclassification," he would have been eligible for the enhanced 15-day monthly ETC accrual much earlier than September 13, 2025, and earned an additional 138 days of ETCs. Pet. at 12; Reply at 6. Petitioner also contends that, had his security and custody score been initially designated as low, he would have been incarcerated at a low-security, rather than medium-security, facility, which would have exposed him to fewer health and safety risks. Pet. at 9. He further contends it would have rendered him eligible for programs like the Residential Drug Abuse Program ("RDAP"), which was recommended by his sentencing Judge, and consideration for home confinement and compassionate release under 18 U.S.C. § 3583(c)(1)(a). *Id.* at 8-9, 12.

As of July 15, 2026, Petitioner represents that the BOP has assigned him a Residential Reentry Center placement date of January 7, 2027, such that the relief sought in his petition would have a near-immediate impact on the timing of his release. *See* ECF No. 18.

**LEGAL STANDARDS**

"A challenge to the execution of a sentence—in contrast to the imposition of a sentence—is properly filed pursuant to § 2241." *Levine v. Apker*, 455 F.3d 71, 78 (2d Cir. 2006) (emphasis omitted). The execution of a sentence may include "such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001). Therefore,

"[t]he proper vehicle for a challenge to the BOP's calculation of earned time credit is a petition for a writ of habeas corpus under 28 U.S.C. § 2241." *Sanchez v. Warden at F.C.I. Hazelton*, No. 24-CV-01251 (LTS), 2024 WL 1969792, at *2 (S.D.N.Y. May 1, 2024).

"When a petitioner brings a habeas petition pursuant to § 2241, the petitioner 'bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence.'" *Dzhabrailov v. Decker*, No. 20-CV-03118 (PMH), 2020 WL 2731966, at *3 (S.D.N.Y. May 26, 2020) (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)).

A petitioner seeking relief pursuant to 28 U.S.C. § 2241 must exhaust their administrative remedies. *See Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001). "This requires compliance with the BOP's four-step Administrative Remedy Program." *Lallave v. Martinez*, 609 F. Supp. 3d 164, 179 (E.D.N.Y. 2022) (citing 28 C.F.R. § 542.10(a)).

Additionally, pro se litigants are afforded "special solicitude" and their filings must be interpreted to "raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474, 477 (2d Cir. 2006) (per curiam) (cleaned up); *see also Lithgow v. Keyser*, No. 20-CV-03655 (VEC) (RWL), 2021 WL 4200722, at *2 (S.D.N.Y. Aug. 16, 2021), *report and recommendation adopted*, 2021 WL 4391122 (S.D.N.Y. Sept. 24, 2021).

## DISCUSSION

Oladokun's Petition raises two "primary errors" related to his custody and security classification under PS 5100.08: the classification of his history of violence as serious, rather than mild, and the designation of his instant offense severity as medium, rather than low. Reply at 6.[1] The government contends that Petitioner has not identified a deprivation of a constitutional right or statutory violation caused by these alleged errors because he does "not have a protected interest in a particular classification score." Opp'n at 8. Petitioner contends that the impact of his custody and security score on his PATTERN score confers a protected interest. *See* Reply at 3, 6. The government does not dispute that Petitioner has exhausted his administrative remedies. Pet., Ex. A; *see generally* Opp'n.

The Court concludes that the BOP's alleged miscalculation of Petitioner's PATTERN score does implicate a cognizable liberty interest. Yet on the merits, the Court finds that BOP did not act contrary to law in assessing Petitioner's history-of-violence and offense severity scores. Petitioner is therefore not entitled to relief.

### A. Constitutional Deprivation

"Congress has given federal prison officials full discretion to control" "prisoner classification and eligibility for rehabilitative programs in the federal

---

[1] The Petition also challenges BOP's inclusion of a nolle prosequi charge, former alcohol abuse, and an expunged incident report into its calculation of Petitioner's score, but the Opposition denies any impact on Petitioner's score from these factors, *see* ECF No. 13 ("Opp'n") at 6, 12 n.8, and Petitioner largely abandons such arguments as a result, *see* Reply at 2-6. The Court does not address these factors, as their impact on the Petition—given the disposition of the primary factors—is inconsequential.

system," such that these decisions cannot generally constitute the deprivation of a protectable liberty interest cognizable on habeas review. *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *see also Pugliese v. Nelson*, 617 F.2d 916, 923 (2d Cir. 1980) (same). An exception arises, however, where the challenged classification imposes an "atypical and significant hardship" or "will inevitably affect the duration of his sentence." *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995). Accordingly, "a protected interest is created where state or federal legislation 'provides a statutory right to good time credit.'" *Cheng v. United States*, 132 F.4th 655, 659 (2d Cir. 2025) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (cleaned up)). Further, although prisoners "have a liberty interest in good time credit they have already earned," *Abed v. Armstrong*, 209 F.3d 63, 66-67 (2d Cir. 2000) (citing *Wolff*, 418 U.S. at 556-58), "no such interest has been recognized in the opportunity to earn good time credit where . . . prison officials have discretion to determine whether an inmate or class of inmates is eligible to earn good time credit," *id.* at 67 (collecting cases).

Petitioner argues that his allegedly miscalculated custody and security score impacted his PATTERN score and thus deprived him of already-earned ETCs. Pet. at 4, 8. From March 23, 2023, through October 11, 2024, Petitioner was placed at the medium recidivism risk level. *See* Blakley Decl., ¶¶ 13-15. Had BOP determined Petitioner was a low recidivism risk during this time period, he would have been credited with 15 ETCs instead of 10 for every 30 days he successfully participated in applicable programming. *See* 18 U.S.C. § 3632(d)(4)(A)(i)-(ii).

Accordingly, Petitioner has identified a cognizable liberty interest in BOP's assessment of his PATTERN score during that period of time.

**B. History-of-Violence Score**

Petitioner raises two challenges to the BOP's classification of his second-degree Maryland misdemeanor assault conviction: (1) that the BOP's designation of that conviction as "serious violence" violates BOP policy and (2) that the BOP's designation should have applied a "categorical" approach to the Maryland assault statute, assessing the elements of the offense, rather than the underlying facts of his conduct, when determining how his prior conviction impacted his score. Pet. at 4, 8.

Petitioner asserts that PS 5100.08 defines "serious violence" as involving the use of a weapon or infliction of serious bodily injury. *Id.* at 4. This is incorrect. As stated *supra*, PS 5100.08 classifies "serious" violence as including "[a]ggressive or intimidating behavior which is likely to cause serious bodily harm or death (e.g., aggravated assault, domestic violence, intimidation involving a weapon, incidents involving arson or explosives, rape, etc.)," for which there was a finding of guilt. PS 5100.08 ch. 4 at 9-10. Petitioner's past conviction for domestic violence involved conduct that falls comfortably within this definition. *See Butler v. Hickey*, 08-CV-00051 (JEG), 2009 WL 2730338, at *2 (S.D. Ga. July 28, 2009), *report and recommendation adopted*, 2009 WL 2905612 (S.D. Ga. Aug. 27, 2009).

Petitioner next contends that Maryland's second-degree assault statute requires a categorical approach to determining the nature of a prior conviction

because its elements do not differentiate between violent and nonviolent conduct. Pet. at 4-6; *see also* Md. Code Ann., Crim. Law § 3-203. The categorical approach is a methodology used to determine whether a prior conviction can serve as a predicate offense under the federal sentencing guidelines or the Armed Career Criminal Act ("ACCA"). *See Mathis v. United States*, 579 U.S. 500, 503-04 (2016) ("Distinguishing between elements and facts is . . . central to ACCA's operation."); *United States v. Moreno*, 821 F.3d 223, 227 n.4 (2d Cir. 2016) ("apply[ing] this framework to sentencing enhancements under the advisory Sentencing Guidelines"); *see also United States v. Barker*, 723 F.3d 315, 319 (2d Cir. 2013) (noting that courts use a "categorical or modified categorical approach" to "determine whether a state offense qualifies as a predicate offense for a federal mandatory minimum sentence" (citation omitted)).

In *Taylor v. United States*, the Supreme Court "offered three main explanations" for its use of the categorical approach to assessments of predicate offenses under the ACCA. *United States v. Beardsley*, 691 F.3d 252, 259 (2d Cir. 2012) (citing *Taylor v. United States*, 495 U.S. 575, 600 (1990)). The *Taylor* Court reasoned that (1) "the language of [the sentencing statute] generally supports the inference that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions," (2) "the legislative history of the enhancement statute shows that Congress generally took a categorical approach to predicate offenses," and (3) "the practical difficulties and potential unfairness of a

factual approach are daunting" where "the trial court," rather than a jury, "would have to determine what that conduct was." *Taylor*, 495 U.S. at 600-01.

In contrast, "Congress has given federal prison officials full discretion to control" classification of prisoners in the federal system. *Moody*, 429 U.S. at 88 n.9. Specifically, BOP has been given the broad authority to classify federal prisoners "according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions." 18 U.S.C. § 4081. As the statute speaks generally to the "nature" of the offense, BOP is not limited to the elements of the offense as defined by state law. *Cf. Taylor*, 495 U.S. at 578, 600 (holding that statutory language, referring to persons who have "three prior convictions" for "violent felonies," emphasizes the statutory definitions of the prior offenses rather than underlying conduct). Accordingly, BOP may permissibly look at the underlying offense conduct. *See, e.g.*, *Butler*, 2009 WL 2730338, at *2 ("Butler's contention that P.S. 5100.08 limits the discretion of the BOP when determining an inmate's history of violence score to a consideration of only the elements of the offense of guilt as found is without merit.").

Accordingly, BOP did not miscalculate the point value attributable to Petitioner's history of violence under PS 5100.08.

**C. Offense Severity Score**

Petitioner additionally contends, Pet. at 3, that the BOP's designation of his

instant offense as "moderate" in severity improperly considered the "intended" losses associated with his conviction, approximately $4,178,501, rather than the crime's associated "unrecovered" losses of $105,056, Blakley Decl., ¶ 9, which would have resulted in a reduced severity designation of "low-moderate," PS 5100.08 app. A at 3. Petitioner has not shown that this designation was contrary to law.

"[P]rison administrators, when making classifications 'need only demonstrate a rational basis for their distinctions.'" *Smith v. Coughlin*, 748 F.2d 783, 787-88 (2d Cir. 1984) (quoting *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 134 (1977)). BOP's use of the intended loss amount in its severity calculation appropriately reflects BOP policy that the severity score incorporate "the most severe documented instant offense behavior regardless of the conviction offense." PS 5100.08 ch. 4 at 7.

Though certainly not entirely analogous to the BOP's custody and security classification analysis, the District Court—and the Second Circuit on appeal—carefully considered its ultimate use of the intended loss figure when deciding to impose a sentencing enhancement under the guideline for conspiracy charges, "which directs application of '[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.'" *Kukoyi*, 126 F.4th at 811 (quoting U.S.S.G. § 2X1.1(a)). BOP had a rational basis for its similar use of the intended loss figure in its calculation of Oladokun's offense severity score.

## CONCLUSION

Accordingly, the Petition is **DENIED**.

SO ORDERED.

Dated: August 25, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge